# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00593-CV

**Lamb County Electric Cooperative, Inc., Appellant**

**v.**

**Public Utility Commission of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT NO. GN302903, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## O P I N I O N

Lamb County Electric Cooperative (the "Cooperative") asserted to the Public Utility Commission (the "Commission") that Southwestern Public Service Company ("Southwestern") had exceeded the scope of its certificates of convenience and necessity and was improperly providing electricity to customers inside the Cooperative's service area. The Commission referred the matter to the State Office of Administrative Hearings for a contested-case hearing before an administrative law judge. The judge concluded that the service Southwestern was providing was consistent with its certificates. The Commission adopted the judge's proposal in its final order. The Cooperative appealed the order of the Commission, and the district court affirmed the Commission's order. The Cooperative appeals the district court's judgment, and we will affirm the judgment of the district court.

## BACKGROUND

This appeal has a complex and lengthy procedural history originating in the 1970s. To facilitate the discussion of the issues raised in this appeal, we will provide a brief summary of the procedural history of this case and of various changes that occurred in the energy market in the 1970s.

Prior to 1975, utilities were allowed to choose the areas and customers that they wanted to provide service to, which meant that more than one utility might be providing service to the same general area.[1] However, the manner in which a utility's customers were selected was significantly altered as a result of the passage of the Public Utility Regulatory Act and the formation of the Commission in 1975. *See* Act of June 2, 1975, 64th Leg., R.S., ch. 721, 1975 Tex. Gen. Laws 2327, 2327-52 (current version at Tex. Util. Code Ann. §§ 11.001-64.158 (West 2007 & Supp. 2008). The Act created a new regulatory scheme for public utilities, under which the Commission began licensing utilities to serve power to a particular area. *See Lamb County Elec. Coop. v. Public Util. Comm'n of Tex.*, No. 03-00-00113-CV, 2001 Tex. App. LEXIS 173, at *2 (Tex. App.—Austin Jan. 11, 2001, no pet.) (not designated for publication). In other words, generally speaking, a single utility was given the authority to provide all of the electricity to customers located inside a specific geographical region. This region was called a service area.

To become a designated provider, utilities were required to apply for and obtain a certificate of convenience and necessity from the Commission. *Id.*; *see also* Tex. Util. Code

---

[1] As a preliminary matter, we note that some of the information presented in this background section comes from undisputed portions of the parties' briefs. *See* Tex. R. App. P. 38.1(f) (explaining that courts "will accept as true" facts stated in briefs unless facts are contradicted).

Ann. § 37.051 (West 2007) (requiring utility to obtain permit before directly or indirectly providing service to public).[2] That meant that electricity providers that desired to continue providing service to an area they had been serving had to apply to the Commission for a certificate.

To make approving the applications and establishing the service areas more efficient, the Commission consolidated the cases so that applications for neighboring service areas were considered in the same docket. Because a utility might request a service area that was too large to consider in one docket, it was possible that a utility might be a party to more than one docket. During the dockets, the boundaries for the neighboring service areas were established, and the boundaries were often reflected in certification maps submitted by utilities. Once the service areas were established, utilities were prohibited from interfering with the operations of another utility by providing service within that utility's service area. *See* Tex. Util. Code Ann. § 37.156 (West 2007) (listing actions Commission may take if utility interferes with operations of another utility).

As discussed previously, prior to the passage of the Act, it was not uncommon for more than one utility to provide service to the same general area. Because the Commission was effectively dividing the State into distinct service areas, it was possible that the boundaries established by the Commission might effectively prohibit a utility from continuing to provide service

---

[2] This appeal was not affected by the recent deregulation of the Texas utility market because the legislature excluded, temporarily, this region and others from the transition to competition. *See* Tex. Util. Code Ann. §§ 39.401-.463 (West 2007) (excluding certain utilities from the transition to competition and providing that those utilities will continue to be "regulated under traditional cost of service regulation"); *id*. § 41.052 (West 2007) (prohibiting utility not participating in customer choice from charging unregulated prices); *see also CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, 252 S.W.3d 1, 7-12 (Tex. App.—Austin Apr. 17, 2008, pet. filed) (op. on reh'g) (describing transition from regulated to deregulated market).

3

to some of its previous customers if the Commission placed those customers inside another utility's service area. This would effectively strand a utility's power lines within the service area of another utility and deprive the stranded utility of any economic benefit from having installed the power lines.

To ameliorate this potentially inequitable result, the legislature and the Commission established several remedies. For example, the legislature enacted section 37.155 of the utilities code, which allowed utilities to enter into agreements specifying the areas and customers to be served by each utility. *Id.* § 37.155 (West 2007); *see also Public Utils. Bd. v. Cent. Power & Light Co.*, 587 S.W.2d 782, 784 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.) (describing how after passage of Act, Commission required utilities to enter into negotiations regarding their service areas under regulation). Further, section 37.155 provided that those types of agreements are "valid and enforceable" and "shall be incorporated into the appropriate areas of certification" as long as the Commission approves the agreements. Tex. Util. Code Ann. § 37.155. In other words, rather than limiting their service areas to distinct regions, the utilities were allowed to negotiate their own arrangements regarding the areas and customers that each utility could serve. If the utilities were able to reach agreements and if the Commission approved the agreements, the agreements established the service areas for the utilities.

The Commission also provided an additional remedy when it promulgated the corridor rule. *See* Commission Rule 052.02.05.056(b)(6)(B) (1976) (current version at 16 Tex. Admin. Code § 25.101(e)(1)-(3) (2008)). The corridor rule specifically applied to situations in which the boundaries created in the certification dockets stranded a utility's pre-existing distribution line inside another utility's newly designated service area. Essentially, the rule allowed a utility to

4

continue providing limited service through the stranded line. *Id.* Under the rule, a utility was given a certification for a 400-foot wide corridor (200 feet on either side of the line) within which the stranded utility was allowed to provide service to customers inside another utility's service area. *Id.* The authorization given under the rule essentially constituted a type of dual certification allowing a particular service area to be served by more than one utility. The rule automatically applied to all certification dockets unless the Commission provided otherwise.[3]

Prior to the passage of the Act, it was common for investor-owned utilities to only provide service to the more population-dense portions of a county, while electric cooperatives, which

---

[3] The original corridor rule provided as follows:

(b) Certificates for Existing Service Area

For purposes of granting Certificates of Convenience and Necessity for those facilities and areas which a utility was providing service on September 1, 1975, or was actively engaged in the construction, installation, extension, improvement of, or addition to, any facility actually used or to be used in providing public utility service on September 1, 1975, unless found by the Commission to be otherwise, the following rules shall prevail for certification purposes:

. . .

(6)(B) The facilities and service area boundary for the following types of utilities providing distribution or collection service to any area, or actively engaged in the construction, installation, extension, improvement of, or addition to such facilities or the utilities system as of September 1, 1975, shall be limited, *unless otherwise found by the commission, to the facilities and the area which lie within 200 feet of any point along a distribution line*, which is specifically deemed to include service drop lines, for electrical utilities. (Emphasis added).

Commission Rule 052.02.05.056(b)(6)(B) (1976); *see* 16 Tex. Admin. Code § 25.101(e)(1)-(3) (2008); *see also Public Utils. Bd. v. Cent. Power & Light Co.*, 587 S.W.2d 782, 785 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.) (discussing corridor rule).

5

were owned by the customers that they served, provided electricity to the areas of a county, generally the rural regions, that were less economically appealing to the investor-owned utilities.

The dichotomy in service slowly eroded over time, and investor-owned utilities began providing service to more rural regions. One type of rural area that began obtaining service from investor-owned utilities was oil fields. This change resulted, in part, because oil field operations began using electricity rather than relying on natural gas.

Starting in the 1960s, Southwestern, which is an investor-owned utility, began building electric distribution lines that could deliver electricity to oil fields. Shortly thereafter, Southwestern began providing service to oil field operations in counties throughout Texas, including counties that were also served by the Cooperative.

To mitigate some of the expense of constructing all of the distribution lines and to lessen the risk of investing in distribution lines for customers that might not want to use its services in the future, Southwestern installed some of the wiring but also allowed the oil field operators to build their own lines that could connect to Southwestern's grid. The point at which Southwestern's customers attached to its grid was called a delivery point. After the electricity passed the delivery point, it traveled along the oil field operator's lines to where the electricity was needed.

After Southwestern had installed some of these distribution lines, the Act was passed. As required by the Act, Southwestern and the Cooperative applied for certificates to continue providing service to their customers. At that time, both Southwestern and the Cooperative were providing electricity to parts of many counties in Texas, including three counties relevant to this appeal: Cochran, Hockley, and Lamb counties.

6

All of the Cooperative's service areas were established in two dockets before the Commission. *See* Tex. Pub. Util. Comm'n, *Application of Bailey County Electric Coop et al. Concerning Certification in Bailey et al.*, Docket No. ECH-6[4] ("Docket 8") (June 29, 1976) (Order); Tex. Pub. Util. Comm'n, *Application of Bailey County Electric Coop et al. Concerning the Counties of Cochran et al.*, Docket No. 42 ("Docket 42") (Oct. 8, 1976) (Order). Although the Cooperative's service areas were determined in those two dockets, the dockets also established service areas for other utilities, including Southwestern. Among other counties, docket 8 addressed service areas for Lamb County, and docket 42 addressed service areas for Cochran and Hockley Counties.

At the conclusion of the dockets, Southwestern and the Cooperative obtained certificates of convenience and necessity. *See Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at *2. The final order in docket 8 stated that prior to the issuance of the order, the Cooperative, Southwestern, and other utilities "reached an agreement and entered a stipulation as to the areas to be served by them" and that the certificates issued were in accordance with those agreements. *See* Tex. Util. Code Ann. § 37.155. Prior to the certification proceeding, Southwestern had been providing service to Amoco Production, Inc., through a delivery point located within Southwestern's service area in Hale County. As described previously, the customer had connected to the delivery point via lines it had constructed. The customer's lines originated in Hale County but terminated in Lamb County. Consequently, Southwestern had been providing electricity to structures located inside what is now the Cooperative's service area.

---

[4] Some time after the initiation of the docket, the docket number was changed from ECH-6 to 8.

As with docket 8, the final order in docket 42 established service areas for the Cooperative, Southwestern, and other utilities. Prior to certification, Southwestern was providing service to several customers that are now located within the Cooperative's service area. *Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at *3. In fact, several of Southwestern's previously installed distribution lines crossed the common border established during docket 42. *Id.*

The final order also incorporated the report and recommendations of the hearing examiner that originally considered the issues in the docket. *See id.* at *2-3. In the report, the examiner stated that the utilities had entered into agreements regarding the ability of the utilities to provide service to customers within the service area of other utilities. Further, the report stated that as part of the agreements, the utilities agreed to waive any right to provide service to customers through the corridor rule. Additionally, concerning the right to provide service in another utility's service area, the report explained that "[t]he agreement[s] would allow the parties to keep existing customers but would prohibit taking a new customer outside of certificated areas" and were "restricted to service of existing customers."

Although the Commission's final order incorporated the examiner's report, the order specifically repeated a conclusion found in the examiner's report that helped define the utilities' respective service areas. This conclusion ("conclusion 7") provides as follows:

> If any distribution lines of Southwestern . . . are located outside [its] service area boundaries . . ., pursuant to agreement by the parties,[5] such utilities are granted a

---

[5] The scope of the agreements entered into by the parties during the two dockets is an issue in this case.

> Certificate of Convenience and Necessity for the facility[6] itself only insofar as such facility is utilized to serve customers presently being served. Such utilities are not granted a Certificate of Convenience and Necessity for a 400-foot corridor as provided by the Commission Rule.

*See* Tex. Util. Code Ann. § 37.155. No party appealed this determination by the Commission.

Several years after the Commission issued its final orders in dockets 8 and 42, the Cooperative learned that some of the customers in its service area that were obtaining power from Southwestern had added additional power lines to their existing power-line networks in order to provide power to new oil wells and equipment.[7] *Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at *4. Because Southwestern was still delivering electricity to those customers through delivery points, the addition of the new lines and new equipment meant that the operators were obtaining more electricity from Southwestern than they had at the time the Commission issued its orders in dockets 8 and 42 and that the electricity from Southwestern was being sent to a larger area.[8]

---

[6] We note that in the record in this case and in the various statutes and rules governing this case, the word "facility" is used in very different contexts. For example, the phrase "consuming facility" is used to refer to an oil well or other similar structure that uses electricity. However, one of the Cooperative's witnesses testified that the word "facility" in conclusion 7 refers to a stranded distribution line.

[7] In particular, Amoco Production Co. and Texaco, Inc., built new lines carrying power to wells that were added to their oil fields after Southwestern obtained its certificates. Tex. Pub. Util. Comm'n, *Petition of Lamb County Elec. Coop., Inc., for Cease and Desist Orders Against Southwestern Pub. Serv. Co. within Hockley and Cochran Counties*, Docket No. 2991 (Dec. 6, 1980) (Examiner's Report).

[8] Although some of the customers that Southwestern was providing power to had added new electric wires to their various interests, none of the customers' geographic interests had increased in size. In other words, although the customers were supplying power to areas that did not have service before, those areas were located within the preexisting geographical boundaries of the customers' interests.

After learning about the increase in service, the Cooperative filed a complaint with the Commission and asked the Commission to issue a cease-and-desist order instructing Southwestern to stop providing electricity to "consuming facilities" located inside the Cooperative's service area. *Id.* at *4; Tex. Pub. Util. Comm'n, *Petition of Lamb County Elec. Coop., Inc., for Cease and Desist Orders Against Southwestern Pub. Serv. Co. within Hockley and Cochran Counties*, Docket No. 2991 ("Docket 2991") (Dec. 6, 1980) (Examiner's Report). The Commission addressed the merits of the contested case in docket 2991.

At the end of docket 2991, the Commission concluded that Southwestern was authorized to provide service, including service over the new lines, to those customers that it had been providing service to when it obtained its certificate. Docket 2991 (Jan. 8, 1981) (Final Order) (adopting recommendation and report of hearing examiner); Docket 2991 (Dec. 6, 1980) (Examiner's report); *see Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at *5. Essentially, the Commission reasoned that the additional service was proper because it was in the public interest to allow Southwestern to provide electricity to its customers that will be used to power both new and old consuming facilities. In particular, the Commission determined that customer-owned power lines are necessary for the development of oil fields and that "the public interest dictated that [Southwestern] be allowed to continue service over [the] newly constructed lines." *Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at *5. Consequently, the Commission did not issue a cease-and-desist order.

In 1995, the Cooperative filed another complaint with the Commission, which also contended that Southwestern was supplying power in a manner that exceeded the scope of its

10

certificates and again asked the Commission to issue a cease-and-desist order. In its complaint, the Cooperative asserted that Southwestern had expanded its service to new customers located inside the Cooperative's service area and had impermissibly utilized customer-owned lines to provide service to customers located inside the Cooperative's service area. Tex. Pub. Util. Comm'n, *Petition of Lamb County Elec. Coop., Inc., for a Cease and Desist Order against Southwestern Pub. Serv. Co.*, Docket No. 14454 ("Docket 14454") (July 24, 1995) (Petition). Specifically, the Cooperative wanted the Commission to prevent Southwestern from providing service to hundreds of consuming facilities located within the Cooperative's service area. The Commission addressed the merits of the contested case in docket 14454.

During docket 14454, several oil-field operators who were buying electricity from Southwestern, including Texaco Exploration & Production, Inc. ("Texaco") and Apache Corporation, intervened. When considering the merits of the claims raised, the Commission stated that the order in docket 42 was "decidedly ambiguous" on the issue of whether Southwestern was restricted to providing electricity to consuming facilities that it was providing service to prior to certification or whether Southwestern may enlarge its service to new consuming facilities provided that the new facilities belonged to its preexisting customers.[9] *Lamb County Elec. Coop.*,

---

[9] The Commission temporarily abated docket 14454 to allow Southwestern to apply for dual certification to the disputed area. Docket 14454 (Apr. 1, 1996) (Order on Certified Issues); *see* Tex. Pub. Util. Comm'n, *Application of Southwestern Pub. Serv. Co. to Amend Certificated Service Area to Provide for Dual Certification in Hockley and Cochran Counties, Texas*, Docket No. 16738 ("Docket 16738") (Dec. 9, 1996) (Order Separating Docket). Essentially, the Commission reasoned that this would be the most practical way to resolve the dispute. Docket 14454 (Apr. 1, 1996) (Order on Certified Issues). Ultimately, the Commission granted dual certification, Docket 16738 (Apr. 29, 1998) (Order), but for reasons not relevant to this appeal, Southwestern subsequently moved to dismiss the dual-certification docket and withdrew its dual-certification application,

2001 Tex. App. LEXIS 173, at \*7; *see, e.g.*, Docket 14454 (Apr. 1, 1996) (Order on Certified Issues) (describing order in docket 42 as ambiguous).

In response to a motion by Southwestern, the Commission summarily disposed of the case in favor of Southwestern and denied the Cooperative's request for a cease-and-desist order. *See* Docket 14454 (Jan. 21, 1999) (Order); *see also* 16 Tex. Admin. Code § 22.182 (2008) (explaining circumstances in which summary disposition is appropriate). The Cooperative appealed the Commission's determination, and the district court affirmed the Commission's order. However, this Court reversed the Commission's order and concluded that, by dismissing the case summarily, the Commission prevented the Cooperative from having an evidentiary hearing regarding the meaning of the Commission's order in docket 42 and whether the order allowed for the type of expansion that the Cooperative took issue with. *Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at \*15-16. In particular, this Court reasoned that because the pre-existing agreement between Southwestern and the Cooperative was incorporated into the Commission's docket 42 order and because the Commission stated that the meaning of its order in docket 42 was ambiguous, the Commission should have allowed the Cooperative to present evidence regarding the understanding of the parties.[10] *Id.* at \*16.

Docket 16738 (Feb. 16, 1999) (Order Granting Motion to Withdraw and Dismiss). Around the same time, the Commission reinstated docket 14454. *See* Docket 14454 (Jan. 22, 1999) (Supplemental Preliminary Order).

[10] This Court also concluded that the case should be remanded for an additional reason. As discussed previously, in docket 2991, the Commission concluded that Southwestern had the right to continue providing service to certain customers located inside the Cooperative's service area. In light of that order, this Court remanded the case to allow the Commission to consider evidence regarding whether the Cooperative's claims in docket 14454 were barred by the doctrine of res judicata due to the Commission's prior determination. *Lamb County Elec. Coop. v. Public Util.*

12

After this Court remanded the case to the Commission, the Commission assigned the case a new docket number, docket 24229, and referred the case to the State Office of Administrative Hearings for an evidentiary hearing. *See* Tex. Pub. Util. Comm'n, *Remand of Docket No. 14454 (Petition of Lamb County Elec. Coop., Inc. for a Cease and Desist Order Against Southwestern Public Service Co.)*, Docket No. 24229 ("Docket 24229") (Sept. 28, 2001) (Preliminary Order). During the proceeding, the administrative law judge sought to answer whether Southwestern had violated the terms of its certificates issued in dockets 8 and 42.

Southwestern, the Cooperative, Apache Corporation, and Texaco all participated in the evidentiary hearing. After the hearing concluded, the administrative law judge issued a proposal for decision. Docket 24229 (Mar. 6, 2003) (Proposal for Decision). When reaching his determination, the administrative law judge considered evidence relevant to ascertaining the meaning of the orders in the two dockets and the intent of the parties when they entered agreements regarding services that may be provided. After reviewing the evidence, the judge concluded that Southwestern had been authorized to continue providing service to its customers that were located in the Cooperative's service area and also been authorized to provide service to meet those customers' future needs. In other words, the judge reasoned that Southwestern's certificates allowed it to

---

*Comm'n of Tex.*, No. 03-00-00113-CV, 2001 Tex. App. LEXIS 173, at *24 (Tex. App.—Austin Jan. 11, 2001, no pet.) (not designated for publication); *see Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992) (explaining that doctrine of res judicata prohibits relitigation of claims that have already been fully adjudicated). On remand, the Commission ultimately concluded that the doctrine did not apply to this case because the circumstances had changed from the time that the Cooperative made its initial determinations in docket 2991. Docket 24229 (May 23, 2003) (Order). That determination has not been appealed. Consequently, we make no additional determination regarding the doctrine in this appeal.

provide "service to new oil field loads of existing customers from the service delivery points it had at the time of the original certification." Further, the administrative law judge concluded that the evidence indicated that the utilities intended for Southwestern to provide service to "new consuming facilities" located inside Lamb, Cochran, and Hockley counties "over customer-owned lines from the points of service certificated to [Southwestern] in 1976." Finally, in light of the preceding, the judge recommended denying the Cooperative's request for a cease-and-desist order. Specifically, the judge surmised that because Southwestern's certificate "encompassed the service currently in dispute," "a cease and desist order [was] inappropriate."

The Commission adopted the administrative law judge's proposal and also issued its own findings and conclusions. Docket 24229 (May 23, 2003) (Order). Specifically, the Commission found that in dockets 8 and 42, it was the intention of the parties that Southwestern "would continue to provide service to its oil field customers . . . and the customers would continue to use customer-owned lines to energize existing and future wells and related petrochemical facilities within their leases and units, including the portions of the leases and units that extended into [the Cooperative's] geographic service area." *Id.*; *see* Tex. Nat. Res. Code Ann. § 101.011 (West 2001) (explaining that oil "unit" may be developed when people with interests in oil or gas fields agree to pool their interests for purpose of recovering or conserving oil and gas). Similarly, the Commission concluded that in dockets 8 and 42, Southwestern was "granted a [certificate] to serve the existing and future needs of its oil company customers via customer-owned lines in the portions of their oil field leases and units that extended into geographic areas of neighboring utilities, including [the Cooperative]."

14

After the Commission issued its final order, the Cooperative sought judicial review of the order. *See* Tex. Util. Code Ann. § 15.001 (West 2007) (stating that party to proceeding before Commission is entitled to judicial review); Tex. Gov't Code Ann. § 2001.171 (West 2000) (explaining that after exhausting administrative remedies, party aggrieved by final agency decision is entitled to judicial review of decision). Southwestern, Texaco, and Apache Corporation intervened in support of the Commission's order. The district court affirmed the Commission's order in its entirety, and the Cooperative filed this appeal.

## STANDARD OF REVIEW

Several of the Cooperative's issues concern the propriety of the Commission's order, findings, and conclusions. When reviewing these types of determinations, we employ the substantial-evidence standard to ascertain whether the Commission's actions are adequately supported by the evidence presented. Tex. Util. Code Ann. § 15.001 (stating that judicial review of agency action is under substantial-evidence standard); Tex. Gov't Code Ann. § 2001.174 (West 2000) (allowing court to reverse agency determination if it is not supported by substantial evidence). Under this standard, we are prohibited from substituting our judgment for the Commission's "as to the weight of the evidence on questions committed to agency discretion," *Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.) (citing Tex. Gov't Code Ann. § 2001.174), because the Commission "is the sole judge of the weight to be accorded the testimony of each witness," *Central Power & Light v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied), and because the Commission "may accept or reject in whole or in part the testimony of the various

15

witnesses who testify," *City of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 695 (Tex. App.—Austin 2005, pet. denied). In making this determination, we are not asked to verify whether "the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the agency's action." *Id.* In fact, the evidence may actually preponderate against the Commission's finding and be upheld as long as there is enough evidence to suggest that the Commission's "determination was within the bounds of reasonableness." *Id.* We will sustain the agency's order if the evidence is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action. *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984).

## DISCUSSION

As a preliminary matter, we note the unique procedural posture of this case and note the issues that we are not confronted with today. In this case, we are not called upon to determine, de novo, whether the utilities in this case actually entered into agreements regarding service that may be provided by each utility. In dockets 8 and 42, the Commission explicitly determined that the parties had entered into those types of agreements, and no party contested those determinations. Further, we are not charged with the task of determining, on our own, what the terms of the agreements were. Rather, we are primarily faced with the task of determining whether the Commission's interpretation of the orders and certificates issued in dockets 8 and 42, as found in the various findings and conclusions in docket 24229, is supported by substantial evidence.[11] *See Public*

---

[11] In making these statements, we are mindful that the administrative law judge postulated in a footnote in his proposal that if he had to choose, he would conclude that "no enforceable contract was reached between" Southwestern and the Cooperative. *See* Docket 24229 (Mar. 6, 2003) (Proposal for Decision). The findings by the Commission state its determination that the parties did

16

*Util. Comm'n v. Houston Lighting & Power Co.*, 645 S.W.2d 645, 647 (Tex. App.—Austin 1986,

ref'd n.r.e.) (explaining that Commission has authority to interpret its prior orders).

The Cooperative raises seven issues on appeal. In its first issue, the Cooperative

contends that the Commission's sixth conclusion in docket 24229, which states that Southwestern

was granted a certificate to serve the future needs of its customers that are located inside the

Cooperative's service area, is erroneous and inconsistent with relevant governing law. In its second

issue, the Cooperative argues that several of the Commission's findings and conclusions forming the

basis for its ultimate determination are not supported by substantial evidence. In its third issue, the

Cooperative contends that the Commission's order in docket 24229 is inconsistent with prior

Commission precedent. In its fourth issue, the Cooperative asserts that the Commission erred by

failing to conclude that Southwestern's right to provide service in the Cooperative's service area

had expired as a matter of law. In its fifth issue, the Cooperative contends that the Commission

---

enter into agreements and that those agreements were approved by the Commission in dockets 8 and 42. *Id.* (May 23, 2003) (Order).

We are also mindful of the holding in *Public Utils. Bd. v. Central Power & Light Co.*, 587 S.W.2d 782. In that case, the Commission held a hearing regarding the scope of an agreement entered into between three utilities. *Id.* at 785. However, prior to resolution by the Commission, two of the utilities sought a temporary injunction from a district court and presented the same arguments made before the Commission. *Id.* The appellate court determined that the district court had jurisdiction over the relief sought, which required the court to construe the agreement entered into by the utilities and that had been approved by the Commission. *Id.* at 787-88.

Although the appellate court in *Public Utils. Bd.* held that the district court had the authority to construe, on its own, the terms of the agreement, the situation presented in that case differs significantly from this case. In *Public Utils. Bd.*, no findings of fact or conclusions of law had been issued by the Commission prior to the district court's involvement, and the case concerned a temporary injunction, not an appeal from a final administrative order.

17

erred by failing to issue a cease-and-desist order. In its sixth issue, the Cooperative argues that the Commission erred by failing to properly consider the burden of proof when making its ultimate determination. Finally, in its last issue, the Cooperative insists that the Commission erred by failing to impose some form of sanction on Southwestern for failing to produce evidence that the Commission had requested. For ease of reading, we will address the Cooperative's second issue first and then address the remaining issues in the order that they were presented by the Cooperative in its briefs. Also, because the issues are related, we will address the Cooperative's sixth and seventh issues together.

**The Commission's Findings and Conclusions Are Supported by Substantial Evidence**

In its second issue, the Cooperative argues that the Commission erred by determining that Southwestern and the Cooperative entered into agreements allowing Southwestern to increase the level of service that it provided to customers located inside the Cooperative's service area.[12] In particular, the Cooperative asserts that several of the Commission's findings in docket 24229 that serve as the basis for that ultimate conclusion are not supported by substantial evidence. We will

---

[12] In its brief, the Cooperative states its second issue as follows: "The Trial Court erred in that reasonable minds could not differ on the fact that there was no agreement between [Southwestern] and [the Cooperative] which would allow the use of customer-owned lines to cross certification boundaries." One of the appellees interprets this statement as meaning that no agreements were reached in dockets 8 and 42 and notes that that argument constitutes "a reversal of the position" that the Cooperative had previously taken, which seemed to acknowledge the existence of the agreements between the parties. For reasons we previously discussed and in light of the fact that the focus of the remainder of the Cooperative's discussion under this issue disputes the ability of Southwestern to provide service to additional locations inside the Cooperative's service area, we construe the issue as attacking the scope of the agreements and not the existence of the agreements themselves.

address the specific findings and the conclusion below, but generally the Cooperative argues that the Commission's determinations are not supported by any evidence in the record and that all of the evidence pertaining to the agreements actually cuts against those determinations.[13]

To resolve this issue, we will group related determinations and address them together.

**Findings 16 and 17**

In findings 16 and 17, the Commission discussed the geographic boundaries of the oil field leases and units that Southwestern had been providing service to. The Commission found that those boundaries had not increased in size since the original certification proceeding but did find that the number of consuming facilities in those areas requiring electricity had increased. In particular, the Commission found as follows:

> 16. The geographic areas encompassing the portions of all the units and leases served by [Southwestern] that extend into [the Cooperative's] service area have not changed since 1976, except that one has decreased in size.

---

[13] The Cooperative also raises another argument concerning the Commission's findings and conclusions in docket 24229. Specifically, the Cooperative asserts that by adopting the findings and conclusions, the Commission violated "the substantial evidentiary standard which is to be accorded to original Docket 8 and 42."

In making this argument, the Cooperative ignores the procedural posture of this case. Had any party appealed the Commission's determinations from dockets 8 and 42, those determinations would have been reviewed for substantial evidence. However, those dockets were not appealed. Rather, in docket 24229, the Commission was required to interpret the determinations made in those dockets addressing the agreements in order to determine whether the Cooperative was providing service that exceeded the authority granted to it by its certificates. The interpretations made in docket 24229 are what has been appealed, and we are, therefore, limited to a consideration of whether those interpretations are supported by substantial evidence.

19

17. Though the geographic area of the portions of the leases or units served by [Southwestern] that extend into [the Cooperative's] service area have not been enlarged since 1976, the number of wells and related petrochemical facilities populating these properties has increased during this period, as would be reasonably expected of oil field operations.

These findings are consistent with the testimony of various witnesses. One of Southwestern's witnesses, Mitch Elmore, testified that none of the customers that were receiving power from Southwestern had increased the size of their fields or units located inside the Cooperative's service area. In fact, Elmore testified that only one oil field had changed in size and that it had decreased rather than increased in size. However, Elmore did testify that the number of wells and other consuming facilities needing electricity within the various leases and units, including those located inside the Cooperative's service areas, had increased since the time that the certificates were granted. Moreover, one of Texaco's witnesses, Stanley Davis, testified it was common knowledge in the oil industry at the time of certification that "the development of a large lease involved changes over time, including drilling new wells and plugging old wells."

**Findings 18, 19, 26, and 27**

In findings 18, 19, and 26, the Commission made determinations regarding the practice of delivering electricity to oil field operators at delivery points and allowing the operators to carry the electricity over their own power lines. Moreover, in finding 27, the Commission determined that in dockets 8 and 42, the Cooperative did not contest the propriety of Southwestern providing service to its customers in the manner described above. Specifically, the Commission found, in relevant part, as follows:

18. It is well-established petroleum industry practice for oil companies to install their own customer-owned electric distribution systems in the oil field units and leases that they are developing.

19. It is well-established petroleum industry practice for oil companies to have their customer-owned electric distribution systems energized and served by a single power supplier at a primary delivery point.

. . .

26. The records in Docket Nos. [8] and 42 reflect [Southwestern's] long standing and continuing practice of serving oil field operators at a primary delivery point, from which the operators connect their own lines to serve specific wells and related oil production facilities.

27. The continuation of [Southwestern's] long-standing manner of serving its customers who were the operators of the oil field units and leases was uncontroverted and acquiesced to by [the Cooperative] in the original certification proceedings.

These findings are supported by substantial evidence. During docket 24229, Sam Hunter, a witness for Southwestern who participated in the negotiations between the parties in dockets 8 and 42, testified that "oil field electric service has always been unique in that rather than the *utility's lines*, the *oil operators' lines* go to the specific oil field producing facilities." (Emphasis added). Evidence was also introduced showing that Southwestern's experience with providing electricity to oil fields was consistent with the pattern described above. Specifically, Hunter stated that Southwestern began providing service to the counties in dispute in the 1940s and that in the 1950s and 1960s, Southwestern engaged in the expensive undertaking of erecting electric distribution lines to provide service to the areas in question. Further, Hunter testified that because the undertaking was so expensive and because there was no assurance that the oil market in Texas would continue being profitable or that the oil field customers would continue to use and purchase electricity, Southwestern ran its power lines along the perimeter of the oil fields and

21

allowed the customers to attach to the lines. Evidence of this practice was also presented to the Commission when Southwestern applied to amend its applications in dockets 8 and 42. In particular, Southwestern presented testimony and evidence that the oil field operators it was providing service to inside the Cooperative's service area built their own distribution lines throughout their leases and that Southwestern delivered its electricity to "one point of service."

Moreover, in attacking the evidentiary basis for these findings, the Cooperative does not argue that it objected to the prospect of Southwestern continuing to provide service to customers via preexisting delivery points and allowing those customers to transfer power over their own distribution lines. Similarly, in making its claims on appeal, the Cooperative does not deny that Southwestern had been providing service to oil field operators in this manner for some time, nor does the Cooperative deny that after certification, some of these operators were located within the Cooperative's service area. Finally, we also note that the Cooperative did not begin disputing the propriety of Southwestern providing service to customers inside the Cooperative's service area until years after the Commission had issued its final orders in dockets 8 and 42.

**Findings 22, 24, and 25**

In findings 22 and 25 and part of finding 24, the Commission found that in dockets 8 and 42, Southwestern was given the authority to continue providing service to customers that were located outside of its service area and that Southwestern and the Cooperative entered into agreements in those dockets allowing Southwestern to continue providing service to customers that were located inside the Cooperative's service area. Specifically, the Commission found, in relevant part, as follows:

22

22. In Docket No. [8], Southwestern was certificated to continue to serve oil field loads in [the Cooperative's] service area through customer-owned lines.

. . .

24. In Docket No. 42, the parties agreed [that Southwestern's certificate] would include the right to continue to serve customers that it was presently serving outside of its geographic service area boundary.

25. In meetings among the parties to Docket Nos. [8] and 42 there was general agreement between [Southwestern] and the negotiating representative for the cooperatives, including [the Cooperative], that [Southwestern] would continue to provide oil field service from primary delivery points via oil field operator customer-owned lines including the portions of the operating units or leases that extended into a neighboring utilit[y']s service area.

These findings are consistent with the terms of the orders issued in dockets 8 and 42 and with testimony that was presented to the Commission.

*Docket 8*

Prior to certification, Southwestern had been delivering electricity to Amoco through a delivery point in Hale County, and Amoco had built lines that carried the electricity to consuming facilities located in Lamb County. During docket 8, Hunter testified that Southwestern was providing service to areas outside of its boundaries found on the certification maps and that by filing its application Southwestern was specifically seeking authority to continue providing service to customers that it was serving immediately prior to certification. After hearing testimony and considering the evidence presented, the Commission issued its order in docket 8 stating that Southwestern and the Cooperative had entered into an agreement regarding the service that they could provide. That agreement was incorporated into the final order in docket 8 and, therefore, its

23

accompanying certificate. Specifically, the order stated that the parties to the docket were entitled to certificates for "areas which they have agreed" to serve.

Additionally, during docket 2991, Delbert Smith, the general manager of the Cooperative, testified regarding the agreement between the parties in docket 8 and stated that the agreement allowed for Southwestern to continue providing electricity to its oil field customers and that the Cooperative did not have any objection to Southwestern continuing to provide service to its prior customers and allowing the customers to distribute the electricity to consuming facilities located inside the Cooperative's service area. In particular, Smith testified as follows:

> Q: So then you are not objecting to the service by Southwestern to Amoco at the primary metering point in Hale County if Amoco takes that power through its customer-owned lines and uses it for the load that existed as of the certification date?
>
> A: Okay. Serving any load that existed prior to certification.
>
> Q: You have no objection to that?
>
> A: We have no objection to that.[14]
>
> Q: So, and then likewise with Texaco, you have no objection to the service, the delivery of power by Southwestern to Texaco for Texaco's use at Well 1 and 2?
>
> A: No, that's what the agreement was. We have no problem with that.[15]

---

[14] We note that this testimony is inconsistent with the Commission's ultimate determination that Southwestern's certificates allow it to increase the level of service that it provides to its customers that are located inside the Cooperative's service area in order to meet its customers' future needs. Although this testimony does not directly support that determination, for reasons that will be more thoroughly explored later in the opinion, we conclude that the Commission's determination regarding future needs is supported by other evidence.

[15] Smith provided similar testimony in docket 16738, the dual-certification docket that was eventually dismissed. In that docket, Smith stated that Southwestern had "the right to continue to serve any well that was in—that was electrified" before the need for certification.

Smith's testimony was also echoed by another of the Cooperative's witnesses, Donald Stubbs, who was a field engineer for the Cooperative. In docket 24229, Stubbs stated that the utilities in docket 8 made arrangements allowing consuming facilities to continue receiving service from the utility that it was obtaining service from at the time of certification. Furthermore, in docket 24229, Hunter testified that the Commission granted certificates that allowed utilities to continue providing service to preexisting customers when it issued its order in docket 8. This statement is also consistent with the testimony of David Hudson, another of Southwestern's witnesses, who testified that the parties to docket 8 agreed to allow Southwestern to continue serving its preexisting customers whose leases or units were now, at least, partially located inside the boundaries of another utility's service area.

Finally, in docket 24229, when describing testimony that he had provided in docket 8, Hunter commented that there was no "indication of any dispute concerning [Southwestern's] continuation of electric service to oil field customers at existing points of delivery who use customer-owned lines" and then transfer the power to various parts of their oil field leases or units. Similarly, in the proposal for decision in docket 24229, the administrative law judge noted that in docket 8 "there was no indication of any dispute concerning [Southwestern's] continuation of electric service to oil field customers at existing points of delivery who use customer-owned lines to serve the portions of their leases or units that extend outside [Southwestern's] geographic service areas." Docket 24229 (Mar. 6, 2003) (Proposal for Decision).

25

*Docket 42*

In Southwestern's application in docket 42, it sought permission to continue providing service to "existing customers presently served." Similarly, during docket 42, Hunter testified that Southwestern was seeking permission to continue serving the customers that it had provided power to for years. Furthermore, in docket 42, when cross-examining one of Southwestern's witnesses, the Cooperative acknowledged that after certification, Southwestern would be providing service to customers inside the Cooperative's service areas that use their own distribution lines.

After considering the evidence and testimony presented, the Commission issued an order in docket 42 stating that the parties had entered into agreements regarding the service that each may provide and that Southwestern was specifically given a certificate to continue providing service to its "customers presently being served" that are now located within the Cooperative's service area. Docket 42 (Oct. 8, 1976) (Order).

Furthermore, during docket 24229, Southwestern asked the Cooperative to produce a copy of the original application that it filed in docket 42. Although the Cooperative was unable to produce a copy of the application that it originally signed, the Cooperative did produce an unsigned copy, which acknowledged the right of other utilities, including Southwestern, to continue providing service to "premises" that they had been serving prior to certification and defined "premises" as including the delivery points that utilities use to provide service to oil field operators. Specifically, the application defined premises as follows:

26

when an electric utility furnished service to a person at one point from which such person distributes electric service over its lines to oil, gas, or water well installations, 'premises' shall be the pole or facility at which point title to the electricity passes to such other person, regardless of the point or points at which such service is metered.

Moreover, during that docket, Hunter testified that the phrase "customers presently being served" found in the final order in docket 42 referred to the operators of oil leases and units that had been obtaining their power from Southwestern and that had been distributing the electricity obtained to consuming facilities located inside their leases and units over power lines that the operators had installed. Additionally, Hunter testified that the order was intended to authorize Southwestern to continue providing service to those oil leases and units and that there was "not a single voice in opposition to the continuation of [Southwestern's] electric service to the oil field operators at existing primary delivery points."[16] Also, Hunter stated that "there was a general agreement" between Southwestern and all of the cooperatives to the various proceedings, including the Cooperative, "that [Southwestern] would continue to provide" service to oil fields "from primary delivery points via the oil field operator customer-owned lines" "in the same manner that it had been doing for a long time." Additionally, Hunter testified that during the meetings with the various cooperatives involved, Southwestern explained that if the cooperatives did not agree to allow Southwestern to provide service to its oil-field customers, Southwestern would not agree to limit its certification and instead would seek a certificate to provide service to the entire area.

---

[16] Hunter also testified that it was customary in the oil industry for the operator of a particular oil field to change, and the Cooperative seemed to acknowledge the continuing nature of the right to provide service to those areas when Smith stated during his testimony that ownership changes would not impact Southwestern's authority to provide service to those areas.

The findings are also consistent with the testimony of Hudson and Smith in docket 24229. Although he disputed the scope of the agreement, Smith acknowledged in docket 24229 that the parties entered into an agreement in docket 42. Further, Hudson testified that during docket 42, Southwestern was under the assumption that it would be allowed to continue to serve oil field operations inside the Cooperative's service area provided that Southwestern was providing service to the same leases and units that it was serving prior to certification. Moreover, Hudson stated that the parties to docket 8 agreed to allow Southwestern to continue serving its preexisting customers even if they were located inside the boundaries of another utility's service area.

**Findings 24, 28, and 30 and Conclusion 6**

In the remaining portion of finding 24, the Commission determined that the utilities had waived their right to rely upon the corridor rule and found that there would have been no reason for the utilities to agree to waive that right unless they had been given the power in a collateral agreement to serve the growing needs of its customers that were located inside another utility's service area. In particular, the Commission found, in relevant part, as follows:

> 24. In Docket No. 42, the parties agreed to waive the Commission's corridor rule. . . . There is no apparent reason [Southwestern] would have agreed to forgo its corridor rights unless it could continue to serve the growing needs of its oil field customers that it was presently serving outside of its geographic service area boundary. There is no apparent reason [Southwestern] would have agreed to forgo its corridor rights unless it could continue to serve the growing needs of its oil field customers from its existing points of delivery.

In finding 28, the Commission repeated its determination that the parties intended that Southwestern be allowed to provide service to oil field operators, including those inside the Cooperative's service area, through delivery points; however, the finding also included an additional

28

determination stating that the parties intended that Southwestern be given the ability to provide

service to cover the needs of *future* wells and other consuming facilities inside the operator's leases

or units. Specifically, the Commission found as follows:

> 28. In docket Nos. [8] and 42, the parties intended that [Southwestern] would continue to provide service to its oil field operators at a primary delivery point and the customers would continue to use customer-owned lines to energize existing and future wells and related petrochemical facilities within their leases and units, including the portions of the leases and units that extended into [the Cooperative's] geographic service area.[17]

Finally, in findings 30 and in conclusion 6, the Commission determined that the

parties to dockets 8 and 42 intended that Southwestern would be allowed to provide service to cover

the operators' *future*[18] electricity needs, including the ability to provide electricity to new consuming

---

[17] In this issue, the Cooperative also urges that finding 29 is not supported by substantial evidence. When this Court remanded docket 14454 to the Commission, this Court instructed that in addition to remanding for consideration of the intent of the parties, the intention of the Commission should also be considered in the analysis of the scope of the previous certificates. *Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at *18. In light of this instruction, the Commission issued finding 29, which is nearly identical to finding 28, except that it substitutes "the Commission" for "the parties" and states that it was the Commission's intention that Southwestern be allowed to provide the service described in finding 28. Given that we ultimately conclude that finding 28 is supported by substantial evidence and that the Commission specifically incorporated the agreements between the Cooperative and Southwestern into its final orders, we also conclude that finding 29 is supported by substantial evidence.

[18] In challenging the determination that Southwestern was allowed to provide service to meet the future needs of its customers that were located inside the Cooperative's territory, the Cooperative refers to a proposed amendment to the certification application filed by Southwestern and to a hearing on the proposed amendment. The request was withdrawn before the issuance of the final order in docket 42. In the proposed amendment, Southwestern stated that it delivered electricity to oil field operators at one or more points and noted that in the past, oil field operators would ask Southwestern to move the location of the delivery points if a different location was more efficient and economical. Accordingly, Southwestern asked for the ability to modify the delivery points if necessary.

facilities located inside the operators' oil field leases or units. Specifically, the Commission found and concluded as follows:

---

The Cooperative argues that this request demonstrates that there was no agreement allowing Southwestern to expand the service that it provided to the areas in dispute. Essentially, the Cooperative contends that it would be unnecessary to make this request if Southwestern already had the ability to provide increased service to the region.

In the proposal for decision in docket 24229, which was adopted by the Commission, the administrative law judge determined that the application was focused on the "extension of service from new service points" and that by filing the amendment, Southwestern was attempting to clarify "that it could provide service to new consuming facilities from new delivery points—rather than solely from existing delivery points." Docket 24229 (Mar. 6, 2003) (Proposal for Decision). In other words, the judge concluded that the amendment was a request for an "additional right" that was not expressly "included in the prior application" and not "an indication that the earlier application did not include service to new facilities from existing delivery points."

The interpretation of the proposed amendment as requesting an additional right distinct from the ability to provide increased service to existing customers is supported by substantial evidence. The terms of Southwestern's original application sought the ability to continue providing service to customers that would soon be located inside the service areas of other utilities. Further, the application specifically stated that Southwestern would apply for permission to install "additional 'points of service'" when a customer requests an additional delivery point, but the application made no mention of needing to apply for permission to provide electricity to its customers through existing delivery points in amounts that exceeded the amount provided at the time of certification. In relation to the possibility of installing new delivery points, the proposed amendment asked for "the right to service the oil and gas fields . . . whether such service is rendered through the existing point of delivery or a different point of delivery requested by the operator of the oil and gas lease in question." When interpreting the effect of the proposed amendment on the rights originally requested in Southwestern's application, the hearings examiner in docket 42 concluded that the amendment was a request to "include a claim for certification of future points of delivery to existing petro-chemical customers, regardless of certified service areas." In other words, the examiner surmised that by requesting the ability to install new delivery points, Southwestern was trying to avoid the necessity of obtaining the Commission's permission before beginning installation. No party disputed that determination. Finally, the interpretation is consistent with testimony given by one of Southwestern's witnesses. Hunter testified that the purpose of the amendment "was to obtain approval to provide the oil field operators *additional* points of delivery without the need to make a new filing for a certificate." (Emphasis added).

30

30. In Docket Nos. [8] and 42, [Southwestern] was granted a CCN to continue to serve the portions of the oil field leases and units operated by [Southwestern's] oil company customers that extended into [the Cooperative's] geographic service area, including the *future* needs of the oil company customers coincident with normal oil field development.

. . .

6. In Docket Nos. [8] and 42, [Southwestern] was granted a [certificate of convenience and necessity] to serve the existing and *future* needs of its oil company customers via customer-owned lines in the portions of their oil field leases and units[19] that extended into geographic service areas of neighboring utilities, including [the Cooperative].

(Emphases added).

These findings are supported by substantial evidence. The order in docket 42 specifically stated that Southwestern was "not granted a Certificate of Convenience and Necessity for a 400-foot corridor." Similarly, in docket 42, Newton, the general manager for South Plains,

_____

[19] In its reply brief, the Cooperative takes issue with the inclusion of the language "oil field leases and units" in conclusion six and with the Commission's construction of dockets 8 and 42 as granting Southwestern a certificate to continue providing service to "customers." In particular, the Cooperative asserts that neither of the orders in dockets 8 or 42 granted the Cooperative the right to provide service to leases or units and further contends that the final orders in the dockets, particularly conclusion 7 from docket 42, certified "distribution lines," not customers, that Southwestern was allowed to continue to use.

However, we previously concluded that substantial evidence supports the Commission's determination that Southwestern was certified to provide service to its customers in existence at the time of certification, including the operators of oil field leases and units whose electricity needs extended into portions of the Cooperative's service area. Moreover, in this subissue, we also conclude that substantial evidence supports the Commission's determination that Southwestern was given the authority to serve the future needs of those operators. In light of these determinations, we cannot conclude that the Commission's construction of its prior orders or its inclusion of the phrase "oil field leases and units" in its determinations was inadequately supported by the evidence presented.

testified that all of the parties to docket 42 agreed to waive the corridor rule because the parties created their own agreements regarding the service that the utilities could provide. Smith echoed that testimony by stating, during docket 42, that the parties had entered into their own agreements that replaced the corridor rule.

In docket 24229, when testifying regarding the corridor rule, Hunter stated that the parties agreed to waive the corridor rule that would otherwise have authorized a utility to continue using a power line that had become stranded inside another utility's service area. In other words, Southwestern agreed to give up the ability to serve customers located inside the corridor and to serve new customers that move into the corridor. Moreover, Hunter testified that from a financial standpoint and in light of the expense of installing distribution lines, it would make no sense for Southwestern to waive the corridor rule and forgo expanding its service within that corridor unless Southwestern had otherwise retained the right to continue providing service through the power lines. Further, Hunter testified that although Southwestern "agreed to waive corridor rights," it did so with the intention of continuing "to provide service to the oil field operators at the single primary delivery points on those distribution lines."

Moreover, in docket 42, Hunter testified that Southwestern was seeking permission to continue to serve the customers to which it had historically provided service and to serve the customers' future needs. That testimony is supported by the statement prepared by Newton in docket 42 that, in part, explained the service agreement between Southwestern and South Plains. In the statement, Newton requested that Southwestern be given a certificate to serve "additional oil field type loads (petrochemical) as can be served without extension of its facilities from its location

32

as it presently exists." In docket 24229, Hunter also explained that during the earlier dockets there was no "opposition to the oil operators' use of the [Southwestern] supplied electric service to fulfill the operators changing needs coincident with normal oil field production."

Hudson provided similar testimony during docket 24229. He stated that in dockets 8 and 42, Southwestern was given the authority to provide service to future consuming facilities added in the normal course of development to the leases and units of Southwestern's customers located inside the Cooperative's service area. Moreover, Hunter testified that the consuming facilities in dispute were added in the normal course of development. Furthermore, he stated that although Southwestern's service would be limited to the distribution lines and points of delivery it had previously installed, the agreement between the utilities allowed customers to continue their practice of using and installing their own distribution lines to meet their current and future needs.

Davis's testimony in docket 24229 also supports the determination that Southwestern was given the authority to serve its customers' future needs. As mentioned previously, Davis testified that it was common for oil operators to add new consuming facilities when they developed an oil field. Further, he stated that after Southwestern began installing distribution points, Texaco "made development plans based on the assumption that it would use electric power distributed over customer owned lines" when it continued to develop its properties.[20] Moreover, Davis stated that

_____

[20] During docket 24229, the Cooperative did refer to and present evidence indicating that Southwestern was not allowed to provide electricity to serve the needs of oil field operators that were in excess of what Southwestern was providing at the time of certification. For example, Smith testified that the certificates did not allow Southwestern to provide power to new consuming facilities that were installed in the oil fields because those facilities were located within the Cooperative's singly-certificated area. Similarly, Smith testified that the agreement between the parties in docket 42 was "intended to be restricted to a stranded distribution line's use to provide

the normal development of an oil lease involved making significant changes to the lease, including creating new wells, and that Texaco believed that it would be allowed to obtain all of its power needs from Southwestern. Finally, Davis testified that Texaco did not generally develop properties with split-distribution systems and that requiring Texaco to split where it obtained its electricity from at the time of certification would not have benefitted Texaco financially and would have been inconsistent with oil industry practice at that time.

For these reasons, we conclude that all of the disputed findings and conclusion are supported by substantial evidence and, accordingly, overrule the Cooperative's second issue on appeal.[21]

---

continued then-level of service to the consuming facilities controlled by then-specific customers, then being served." Moreover, Stubbs testified that Southwestern's authorization to serve customers within the Cooperative's service area would diminish over time. In particular, he stated that the certifications allowing for service in another utility's territory were kept to a minimum and given with the belief that most of the certifications would expire due to inactivity. Finally, Stubbs testified that when the parties began establishing their service area boundaries, the parties did not consider the future development of any oil field lease or unit; instead, he argued that the parties looked solely to the distribution lines that were in place and the consuming facilities that were already in existence.

Although this type of evidence does not support the Commission's determination, as detailed previously, evidence in direct opposition to this testimony was also presented to the Commission. In resolving the conflicting testimony, the Commission was free to accept or reject the testimony of the various witnesses when making a determination regarding what if any weight to give to the testimony of the various witnesses. *See City of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 695 (Tex. App.—Austin 2005, pet. denied). Moreover, when resolving the conflicting evidence in favor of Southwestern, the administrative law judge also stated that Hunter was the only witness who testified during docket 24229 that actively participated in the negotiations between the parties in dockets 8 and 42. Docket 24229 (Mar. 6, 2003) (Proposal for Decision).

[21] In its second issue, the Cooperative also contends that finding 31 is not supported by substantial evidence. Finding 31 states that "[w]ith one exception, [the Cooperative] has failed to establish that [Southwestern] is providing service to any customer inconsistent with the terms of [Southwestern's] CCN." All of the reasons given supporting the other disputed findings also compel us to conclude that finding 31 is supported by substantial evidence. Moreover, we note that,

34

**Conclusion 6 is Consistent with Relevant Law**

In its second issue, the Cooperative asserted that conclusion 6, in addition to other Commission determinations, was not supported by substantial evidence. In its first issue, the Cooperative also disputes the propriety of conclusion 6.

First, the Cooperative contends that the authority granted under conclusion 6 went beyond the certifications that the Cooperative received in dockets 8 and 42. As support for this assertion, the Cooperative refers to the certification maps utilized in the two dockets that show the service areas of various utilities, including the Cooperative and Southwestern, at the time the utilities originally obtained their certificates. The Cooperative notes that the maps do not make any explicit reference to the ability of Southwestern to serve the existing or future needs of the customers located inside the Cooperative's service area.

Previously, we concluded that the various findings that form the basis for conclusion 6 as well as conclusion 6 itself are supported by substantial evidence. In light of that determination, we cannot conclude that conclusion 6 exceeds the limits of the certifications granted in dockets 8 and 42.

Second, the Cooperative complains that by allowing Southwestern to serve the "future needs" of the customers at issue, the Commission has violated the dictates of the utilities code. Specifically, the Cooperative asserts that the utilities code requires certification for a particular

---

regarding the one exception, the finding also states that Southwestern "acknowledged th[e] error and has agreed to discontinue service when [the Cooperative] informs it that [the Cooperative] is ready to provide service to this customer. Accordingly, no relief is required to address the isolated issue here."

area, not for particular customers. As support for this proposition, the Cooperative cites to subsection 37.051(b) of the utilities code, which provides as follows:

> Except as otherwise provided by this chapter, a retail electric utility may not furnish or make available retail electric utility service to an area in which retail electric utility service is being lawfully furnished by another retail electric utility *unless the utility first obtains a certificate that includes the area in which the consuming facility is located*.

Tex. Util. Code Ann. § 37.051(b) (emphasis added). Further, the Cooperative argues that because the Commission's interpretation of the certificates issued in dockets 8 and 42 provides no express limitation on the future needs that Southwestern can serve or on the locations to which service may be provided, the Commission effectively issued an "open-ended" certificate authorizing Southwestern to provide service in the Cooperative's service area that were constrained solely by the needs and desires of Southwestern's customers. Stated differently, the Cooperative asserts that the Commission's conclusion would allow Southwestern to further invade the Cooperative's service area and reach into areas not expressly "specified within [Southwestern's] certification boundaries."[22]

---

[22] When making its various assertions, the Cooperative, on more than one occasion, refers to a prior docket as support for the proposition that by providing electric service to a region outside of its service area through customer-owned lines, Southwestern contravened prior Commission precedent. *See* Tex. Pub. Util. Comm'n, *Complaint of Nueces Elec. Coop.*, Docket No. 4572 (July 2, 1984) (Order). In that prior docket, the Commission concluded that "a public utility may not provide service through customer-owned lines to a consuming facility located outside the public utility's certificated area until the utility has received authority to serve the area." *Id.* In light of that statement, the Cooperative insists that Southwestern's service to customers located inside the Cooperative's service area is improper.

36

In further support of its assertion that the Commission's actions contravene the dictates of subsection 37.051(b), the Cooperative refers to *Citizens Coop Gin v. General Tel. Co.*, 728 S.W.2d 903 (Tex. App.—Austin 1987, no writ), which involved a predecessor to subsection 37.051(b). In that case, Citizens Coop Gin (the "Gin") attempted to obtain new telephone service from South Plains Telephone Cooperative ("Telephone Coop") rather than obtain the service from its existing carrier, General Telephone Company ("General Telephone"). *Id.* at 904. To obtain the service, the Gin installed telephone distribution lines in Telephone Coop's service area that would connect the Gin to the Coop's distribution network. *Id.* After learning about this, General Telephone asked the Commission to issue a cease-and-desist order on the ground that Telephone Coop "was providing service beyond its certificated area." *Id.* at 905. The Commission denied the request. *Id.* On appeal, this Court concluded that the Commission erred by allowing Telephone Coop to provide service to the Gin because the statute in effect at that time, like subsection 37.051(b), required that a utility seeking to provide service to an area that has been certificated to another utility must first obtain its own certificate stating "the area in which the *consuming facility* is located." *Id.* at 906 (emphasis added).

---

The Cooperative's reliance on this prior docket is misplaced. In that docket, a utility sought to provide service to an area that it had not received a certificate to serve and began distributing electricity to that area before seeking permission from the Commission. In this case, Southwestern was providing service to the customers in dispute prior to the need for certification and was given certificates authorizing it to serve its preexisting customers. Moreover, the Commission determined, based on substantial evidence, that the authorization encompassed the right to serve the future needs of its preexisting customers. *Cf. City of Coahoma v. Public Util. Comm'n*, 626 S.W.2d 488, 490-92 (Tex. 1981) (concluding that City of Coahoma was entitled to continue providing service to customers that it was serving prior to passage of Act but were now located in another utility's water district).

In light of this last statement, the Cooperative argues that this Court has mandated that if a utility seeks to provide service in another utility's service area, the utility must first obtain a certificate that specifically describes the geographic locations of the customers that the utility is seeking to serve. Further, the Cooperative contends that because the Commission never issued a certificate providing that type of geographic specificity, conclusion 6 is inconsistent with the reasoning of the *Citizens Coop Gin* case.

For several reasons, the Cooperative's reliance on subsection 37.051(b) is misplaced. First, subsection 37.051(b) applies to circumstances that are not present in this case. Subsection 37.051(b) applies, by its terms, to situations in which a utility is attempting to provide service to an area that it has not been given a certificate to serve and that has already been certificated to another utility. Tex. Util. Code Ann. § 37.051(b). However, those circumstances are not present here. In the present case, prior to the passage of the Act, Southwestern had been providing service to customers located inside what is now the Cooperative's service area. Moreover, the Commission found that prior to certification and in accordance with the utilities code, Southwestern and the Cooperative entered into agreements regarding the service each could provide. *See id.* § 37.155.[23] The Commission approved those agreements, and they were incorporated into the certificates issued in dockets 8 and 42. In other words, Southwestern was given certificates to provide service to customers in accordance with the terms of the agreements that Southwestern and

---

[23] We note that the terms of section 37.155 allows utilities to enter into agreements regarding the areas that they will serve and regarding the customers that they will serve. Tex. Util. Code Ann. 37.155 (West 2007) (explaining that agreements may designate "areas and customers to be served by the utilities").

the Cooperative entered into. Further, substantial evidence supports the Commission's interpretation of the agreements and certificates as allowing Southwestern to serve the current and future needs of its preexisting customers now located inside the Cooperative's service area.

Morever, even assuming that subsection 37.051(b) were applicable to the current circumstances, the provision also specifically allows for exceptions to its requirements if they are authorized by anther provision of the utilities code. *Id.* § 37.051(b) (explaining that provision applies "[e]xcept as otherwise provided by this chapter"). One such exception is found in section 37.155, which, as discussed previously, allows utilities to enter into agreements regarding the service that they will provide. *Id.* § 37.155.

In light of the preceding, we also conclude that the Cooperative's reliance on the *Citizens Coop Gin* case is misplaced. In that case, unlike the current case, Telephone Coop was not given a certificate authorizing it to provide service to customers in another utility's service area. Moreover, when stating that a utility was required to obtain a certificate detailing the location of a proposed consuming facility before providing service to the facility, this Court did not, as alleged by the Cooperative, impose any additional geographic requirement for certification and was merely repeating the mandates of the predecessor to subsection 37.051.

We also disagree with the Cooperative's assertion that the Commission authorized Southwestern to provide essentially unlimited service in the Cooperative's service area. In issuing the various certificates, the Commission complied with the provision of the utilities code allowing utilities to enter into agreements regarding their service areas. Further, although the final orders in dockets 8 and 42 do not themselves provide the specific limitations on the service that Southwestern

39

could provide inside the Cooperative's service area, the Commission found in docket 24229 that the parties' intention when entering the agreements was to allow Southwestern to provide service to its preexisting customers so that those customers could energize consuming facilities located "within their leases and units." Docket 24229 (May 23, 2003) (Order). In other words, the Commission found that the agreements were limited by the customers that could be served and by the specific geographic regions that could be served: service was limited to customers in existence prior to certification and to those customers' leases and units, which had been established by the time of certification.[24] Moreover, the Commission also found that the agreements allowed Southwestern to provide service through delivery points that had been used to provide power to those customers in the past. Those delivery points were also geographically fixed.

For these reasons, we overrule the Cooperative's first issue on appeal.

**The Commission's Order is Not Inconsistent with its Prior Precedent**

In its third issue, the Cooperative contends that the Commission's order is inconsistent with prior Commission precedent. Specifically, the Cooperative argues that in the past, the Commission has looked to certification maps to ascertain the scope of a certificate but avers that in this case, the Commission improperly considered other evidence. Essentially, the Cooperative asserts that the Commission should have limited its consideration to the certification maps because they "are the primary evidence to determine certification agreements." Further, the Cooperative

---

[24] It is worth noting that during docket 24229, Hunter testified that the certificates would not authorize Southwestern to provide service to areas beyond "the geographic areas of the units or leases that existed in the 1975-1976 time frame."

argues that by considering additional information in this case, the Commission has violated its prior precedent and failed to adequately explain its decision to diverge from that precedent. *See Flores v. Employees Ret. Sys.*, 74 S.W.3d 532, 539-40 (Tex. App.—Austin 2002, pet. denied) (explaining that agencies are "not bound to follow its decisions . . . in the same way that a court is bound by precedent" but that courts frequently require agency to explain inconsistent agency determinations or explain why agency departed from its previous policy). Finally, the Cooperative insists that the certification maps in this case unambiguously demonstrate that Southwestern was not granted a certificate to serve the "future needs" of various oil field operators. For these reasons, the Cooperative argues that the Commission's order is "arbitrary, capricious, and an illegal and unwarranted exercise of policy discretion."

In making these assertions, the Cooperative relies on an unrelated prior Commission docket, docket 24815. *See* Tex. Pub. Util. Comm'n, *Complaint of Fayette Elec. Coop., Inc., Against the City of Schulenburg, Tex.*, Docket No. 24815 ("Docket 24815") (Nov. 15, 2002) (Final Order). In that docket, the Commission was asked to determine whether the City of Schulenburg was encroaching on another utility's service area. To resolve the dispute, the location of the boundary between the two utilities had to be considered, and the Commission analyzed the relevant certification map to ascertain the boundary between the City of Schulenburg and the other utility.[25]

---

[25] In its first issue, the Cooperative also raises arguments concerning the certification maps. In particular, when challenging the basis of the Commission's determination that Southwestern had been given the authority to provide future service to its customers located inside the Cooperative's territory, the Cooperative argues that the determination cannot be supported by substantial evidence because the maps used during dockets 8 and 42 make no mention of allowing Southwestern to provide service to those customers. Further, the Cooperative states that the "best" and "only" evidence of the agreement between the utilities are the certification maps used in dockets 8 and 42

41

For the reasons that follow, we disagree with the Cooperative's assertions and its reliance on docket 24815. First, the type of information obtained from the map in docket 24815 is fundamentally different than the type of information at issue in this case. In docket 24815, the Commission had to ascertain the location of the boundary between the City of Schulenburg and another utility. In making this determination, the Commission reasoned that it was more appropriate to use a map prepared during a prior certification proceeding than a handwritten description. In the current case, however, the geographical boundaries between Southwestern and the Cooperative are not in dispute[26]; rather, the issue in this case is the extent to which Southwestern was given the authority to provide service to customers inside the Cooperative's service area. The fact that resolution of the issue in docket 24815 was accomplished by examining the certification map would

and the final orders in those dockets and further insists that none of those items support the Commission's determinations. The Cooperative also notes that Southwestern played a significant role in preparing the maps and, therefore, contends that the maps should be construed against Southwestern.

The Cooperative's argument disregards the other evidence presented, including the determinations made in dockets 8 and 42 and the testimony and evidence presented in those dockets as well as in docket 24229, that support the Commission's determinations. Moreover, the fact that Southwestern prepared the maps would not seem to foreclose the possibility that the maps were not meant to include all of the terms of the agreements between the parties. The Cooperative refers to no case law or Commission policy requiring parties entering into agreements under section 37.155 of the utilities code to provide all the details of the agreement on a certification map. *See* Tex. Util. Code Ann. § 37.155. Furthermore, a review of the maps reveals that not all of the terms of the agreements were incorporated into the maps. Specifically, the maps make no mention of Southwestern agreeing to waive the benefits of the corridor rule.

[26] During docket 24229, the Cooperative's engineering services manager admitted that there was no dispute regarding the boundary between the two utilities and stated that he believed that the dispute was instead "about the intent of the line on the map" and about the scope of rights that were given during the certification proceedings. Moreover, the maps were prepared with the involvement of personnel from the Cooperative and from Southwestern, and the personnel from both utilities verified that the boundary lines were drawn accurately.

42

not seem to foreclose utilization of other evidence for non-boundary disputes, particularly in the circumstances here in which the relevant certificates were issued decades prior to the current dispute and in which the final orders in the earlier dockets approved and incorporated agreements that the utilities had entered into but do not specify all of the details of the agreements.

Additionally, in docket 24815, the Commission concluded that its previous order "unambiguously established the boundary by means of a map."[27] In this case, the Commission made no conclusion stating that the certification maps "unambiguously" established the extent to which the utilities in dockets 8 and 42 could provide service in another utility's service area. Further, when making its determination in docket 24815, the Commission did not ignore all other additional information; in fact, the Commission considered the testimony from the previous certification hearing when making its determination regarding the boundary. In its findings, the Commission stated that the testimony demonstrated that the complaining utility approved the map and the boundaries written on the map.

Second, the Cooperative's argument ignores the procedural history of this case. In *Lamb County Elec. Coop.*, the Cooperative appealed the Commission's order in docket 14454 that originally interpreted the extent to which Southwestern could provide increased service to the customers located inside the Cooperative's service area. 2001 Tex. App. LEXIS 173. The Cooperative complained that it was denied the opportunity to introduce evidence regarding

---

[27] It is worth noting that although the Commission made no specific ambiguity finding in the final order in docket 24229, the Commission previously characterized the rights regarding the ability to provide service to customers inside the Cooperative's service area previously granted to Southwestern as ambiguous. *See Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173 at *16.

the circumstances of the earlier certification proceedings and regarding the agreements reached by the parties. In particular, the Cooperative wanted to introduce copies of the transcripts from the certification proceedings and testimony from witnesses who helped formulate the agreements referenced in the certification dockets. *Id.* at *10, *15. In light of the Cooperative's complaints, this Court remanded the case with instructions that the Commission conduct an evidentiary hearing, and an evidentiary hearing was held. *Id.* at *15. The Cooperative cannot now maintain a claim that the Commission should not have considered the very evidence the Cooperative fought so vigorously to introduce.

For these reasons, including the fact that the maps did not contain all of the agreements between the parties, we cannot conclude that the Commission's decision to consider evidence beyond the maps and orders from dockets 8 and 42 was inconsistent with its prior precedent.

**Southwestern's Authorization Did Not Expire as a Matter of Law**

In its fourth issue on appeal, the Cooperative argues that the Commission erred when it issued its order because it failed to conclude that Southwestern's right to continue providing service to customers located in another utility's service area expired as a matter of law.[28] In making this assertion, the Cooperative contends that the right to continue providing service was a limited and

---

[28] In this issue, the Cooperative only addresses docket 42 and again states that Southwestern was not given the authority to continue providing service to customers in Lamb County because Southwestern had no stranded lines in Lamb County. However, we previously concluded that substantial evidence supported the Commission's determination that Southwestern was given the right to continue providing service to its current customers in both dockets.

44

a conditional right that automatically expired when Southwestern violated the terms of the agreement by providing service that exceeded the amount of service provided at the time of certification and by providing service to new consuming facilities. As proof of the limited and conditional nature of the right, the Cooperative refers to the portion of conclusion 7 from the order in docket 42 that stated that Southwestern was given the right to continue providing service to facilities "only insofar as such facility is utilized to serve customers presently being served."

For the reasons that follow, we cannot agree with the Cooperative. First, as previously discussed, Southwestern and the Cooperative entered into various agreements prior to certification, and those agreements were incorporated into the parties' certificates of convenience and necessity. In other words, Southwestern was specifically certificated to provide electricity in accordance with the terms of those agreements.

Second, we have previously determined that substantial evidence supports the determination that the agreements allowed Southwestern to provide the service in dispute, i.e., service to meet the future needs of its customers located inside the Cooperative's territory.

Third, even assuming that Southwestern had impermissibly exceeded the scope of its certificate, we fail to see how that action would lead to an automatic expiration of the portion of the certificate authorizing Southwestern to provide service to customers inside the Cooperative's service area. The Commission made no specific determination stating that Southwestern's certificate would expire automatically if Southwestern provided service in a manner that exceeded the scope of its certificate. Moreover, the utilities code provides specific prohibitions against the discontinuation of service. Specifically, it states that a utility must "provide continuous and adequate service" to

45

"every consumer" that the utility was given a certificate to serve, Tex. Util. Code Ann. § 37.151 (West 2007), and must not "discontinue, reduce, or impair service to any part of the holder's certificated service area" unless explicit conditions not applicable to this case are met, *id.* § 37.152(a) (West 2007). Furthermore, although one provision of the utilities code does allow for the revocation of a certificate, it only allows revocation when the Commission finds that the utility never started providing service or stopped providing service to part or all of its certificated area. *Id.* § 37.059(a) (West 2007). The Cooperative has not alleged that Southwestern has stopped providing service to its customers; in fact, it has alleged just the opposite. Additionally, that provision does not describe any circumstances in which a certificate will automatically expire; instead, it requires that the Commission provide the utility with "notice and [a] hearing" before it may revoke a utility's certificate. *Id.*[29]

In light of the preceding, we cannot conclude that the Commission erred by failing to conclude that Southwestern's certifications had expired as a matter of law and, accordingly, overrule the Cooperative's fourth issue.[30]

---

[29] The testimony of Southwestern's witness, Hunter, also supports this determination. Specifically, he testified that "[c]ertification rights granted by the Commission are enduring, they do not decline over time."

[30] In this issue, the Cooperative also argues that the Commission's interpretation of conclusion 7 erroneously granted Southwestern the "open-ended" right to "virtually unlimited expansion of customer base into [the] Cooperative['s] territory." In light of our previous discussion in issue one describing the limitations imposed on Southwestern's ability to provide service in the Cooperative's service area, we must conclude that the Commission did not provide an open-ended right of extension.

**The Commission Did Not Abuse its Discretion by Failing to Issue a Cease and Desist Order**

In its fifth issue, the Cooperative argues that the Commission erred by failing to issue a cease-and-desist order prohibiting Southwestern from continuing to provide service to the customers in dispute in this case and by refusing to order a transition process under which the customers in dispute would become the Cooperative's customers. Moreover, the Cooperative asserts that as a result of the Commission's failure to act, Southwestern has been allowed to violate certification laws on a daily basis. Further, the Cooperative contends that Southwestern's violations have harmed the Cooperative and its customers who otherwise would have become owners and members of the Cooperative.

In light of our determination that the Commission's order is supported by substantial evidence, including the portion stating that Southwestern was given the authority to serve the existing and future needs of its customers that were located inside the Cooperative's territory, we cannot conclude that the Commission erred by failing to issue a cease-and-desist order or by failing to order a transition process. Accordingly, we overrule this issue on appeal.

**The Commission Did Not Disregard the Burden of Proof or Err by Failing to Issue Sanctions**

The Cooperative's sixth and seventh issues originate from the issuance of a preliminary order by the Commission in docket 24229. *See* Docket 24229 (Sept. 28, 2001) (Preliminary Order). In general, the order stated that in docket 24229 the Commission must determine whether Southwestern had exceeded the scope of its certificates. However, in the order, the Commission also identified six types of information that it believed would be helpful in resolving the dispute between Southwestern and the Cooperative. The first five types of information related

47

to the customers that Southwestern was providing service to and the extent of that service at various times, including when Southwestern was given its certificates, when the Commission issued its order in docket 2991, when the Cooperative filed its petition in docket 14454, and when the Commission issued the preliminary order in docket 24229. In particular, the Commission asked for information concerning the "[i]dentification of the customers served by [Southwestern]," "[t]he geographic area of the portions of the oil field units in question that extended into [the Cooperative's] service area," "[t]he load being served with [Southwestern] supplied power within the portions of the oil field units in question that extended into [the Cooperative's] service area," "[t]he location of the [Southwestern] distribution lines and points of delivery that extended into [the Cooperative's] service area," and "[t]he location of the customer-owned distribution lines and points of delivery that extended into [the Cooperative's] service area but were served with [Southwestern]-supplied power." In addition, the order also stated that resolution of the conflict between the parties should involve consideration of information regarding "[a]ny upgrades, including installation dates, affecting [Southwestern's] distribution lines and points of delivery that extended into [the Cooperative's] service area" that were made after Southwestern was awarded its certificates.

During docket 24229, Southwestern admitted that it could not provide all of the information listed above. In particular, Southwestern could not specify what amount of electricity was delivered to the customers inside the Cooperative's service area.[31] Stated differently,

---

[31] Southwestern was also unable to provide information regarding how many petrochemical consuming facilities were still powered by natural gas at the time of certification, but one oil field customer presented evidence that by the time of certification, most oil field operators had converted to electricity.

Southwestern was unable to segregate the amount of electricity that was sent to each individual oil well or consuming facility. Southwestern also stated that its inability to provide that information was due, in part, to the fact that it had gone through two "customer accounting system changes since 1976, and only the minimum required data was maintained" after the final switch. Although it could not provide the load data requested, Southwestern did provide, for the time periods requested, information regarding customers Southwestern was serving, the locations of oil field units and leases, the location of distribution lines and delivery points, and upgrades.

Southwestern's failure to provide all of the information requested and Southwestern's decision to engage in accounting system changes while the dispute between the parties was ongoing frame the Cooperative's sixth and seventh issues on appeal. In its sixth issue, the Cooperative raises essentially two sets of arguments. In the first set, the Cooperative contends that when Southwestern was given the authority to provide service to customers located inside the Cooperative's service area, Southwestern was merely given an exception to the traditional requirements of certification law. Specifically, the Cooperative argues that Southwestern was given an exception to the requirement of obtaining a certificate to serve an entire geographical area. Further, the Cooperative insists that because Southwestern was merely given an exception, Southwestern had the burden of proving, in response to the Cooperative's allegations, "that every element of its service qualifies under" the terms of the exception.[32] Additionally, the Cooperative contends that to fully comply with its

---

[32] When making this argument, the Cooperative refers to several federal cases stating that a grandfather clause must be strictly construed against the person seeking to invoke it. *See, e.g.*, *United States v. An Article of Drug (Bentex Ulcerine)*, 469 F.2d 875, 878 (5th Cir. 1972) (describing grandfather clause in Food and Drug Act exempting certain drugs from new "effectiveness" requirements), *cert. denied*, 412 U.S. 938 (1973); *United States v. Allan Drug Corp.*, 357 F.2d 713,

burden, Southwestern was required to provide all of the information requested in the Commission's preliminary order, including the information related to the level of service provided to customers over the years, in order to show that it had not violated the terms of the exception. Finally, the

718 (10th Cir. 1966) (same), *cert. denied*, 385 U.S. 899 (1966); *United States v. 1,048,000 Capsules (Afrodex)*, 347 F. Supp. 768, 770 (S.D. Tex. 1972) (same), *aff'd*, 494 F.2d 1158 (5th Cir. 1974); *Honeywell Inc. v. United States*, 228 Ct. Cl. 591 (1981) (explaining that provision of Armed Services Procurement Regulation allowed contractor to continue charging rental costs under terms of long-term leases that were entered into prior to effective date of regulation). In making its argument, the Cooperative also refers to a federal case concerning an exemption to a tax statute in which the court noted that a person claiming to fall within "an exception to a statute has the burden of clearly bringing himself within it and must prove every fact essential to the invocation of the exemption," *see Herren v. United States*, 317 F. Supp. 1198, 1203 (S.D. Tex. 1970), *aff'd*, 443 F.2d 1363 (5th Cir. 1971), and to a case stating that an individual seeking to invoke the protection of an affirmative defense against liability must affirmatively prove the elements of that defense, *see Williams v. State*, 514 S.W.2d 772, 775, 777 (Tex. Civ. App.—Beaumont 1974, writ ref'd n.r.e.) (explaining that statutory provision suspended application of remainder of statute when governor declares "a county to be a drought disaster area" but also noting that individual seeking protection of that provision must prove that all elements were satisfied).

However, the Cooperative's reliance on these cases is misplaced. Although various parties in this case have characterized Southwestern's right to provide service to customers located within the Cooperative's service area as a "grandfather right," the right is dissimilar from the type of grandfather right discussed in the cases the Cooperative cites to, which concern a "[p]rovision in a new law or regulation exempting those already in or a part of the existing system which is being regulated." *See Black's Law Dictionary* 482 (6th abridged ed. 1991); *see, e.g.*, *Save Our Springs Alliance v. City of Austin*, 149 S.W.3d 674, 679 n.1 (Tex. App.—Austin 2004, no pet.) (explaining that statutory provision was grandfather clause because it exempted plats from local land-use regulations enacted after original application for development of that plat was filed). In this case, there is no statute or regulation that exempted Southwestern from newly created regulatory requirements; to the contrary, Southwestern was given certificates to provide service to various customers and areas after complying with the new statutory and regulatory requirements, including the statutory provision allowing utilities to enter into agreements regarding the service that they could provide. *See* Tex. Util. Code Ann. § 37.155. Further, no allegation was made that Southwestern did not satisfy all the new statutory and regulatory requirements prior to obtaining its certificates. Moreover, no tax statute has been alleged to have been violated, and Southwestern is not seeking to invoke the protection of an affirmative defense.

Cooperative argues that by ultimately approving of the service that Southwestern was providing, the Commission erred by failing to require Southwestern to meet its burden.

For the reasons that follow, we disagree with the Cooperative's first set of arguments. The Cooperative's arguments ignore the fact that Southwestern, like the Cooperative, was given its own certificates in dockets 8 and 42. In other words, the Commission determined that Southwestern complied with all of the various certification requirements and issued Southwestern its own certificates authorizing it to serve various customers and areas. In addition, the orders issued in dockets 8 and 42 specifically stated that the certificates awarded were "non-exclusive," *cf.* 16 Tex. Admin. Code § 25.101(b)(1) (2008) (explaining that for certificates for new service areas, "[a]ny certificate granted . . . shall not be construed to vest exclusive service . . . in and to the area certificated"), and as previously discussed, stated that the utilities had entered into agreements regarding the service each utility could provide. Regardless of whether Southwestern bore the burden of providing the information in question,[33] substantial evidence was presented supporting the Commission's determination that the scope of the agreements entered into and, therefore, the certificates issued in the prior dockets encompassed providing service to meet the current and future needs of Southwestern's customers that were located inside the Cooperative's territory.

---

[33] Although it is not necessary to decide which party had the burden of proof to resolve these issues, we do note that by initiating the administrative proceedings at issue in this case, the Cooperative was essentially disputing the service provided by another utility. As a result, it would seem logical to assume that the Cooperative bore the burden of proving that Southwestern was providing service in violation of the requirements of the utilities code. *Cf.* Tex. Util. Code Ann. § 37.051(b) (West 2007) (explaining that utility may not provide electric service to area being lawfully served by another utility unless utility first obtains a certificate that includes area in dispute).

Despite the fact that Southwestern was unable to produce all of the information requested, for the reasons above, we cannot conclude that the Commission failed to adequately consider the burden of proof when making its ultimate determination.

In its seventh issue and in its second set of arguments in its sixth issue, the Cooperative essentially asserts that the Commission erred by failing to impose some kind of sanction on Southwestern for failing to produce all the information requested in the previous order and that the district court erred by affirming the Commission's decision to not impose sanctions.[34] First, the Cooperative contends that because some of the information was lost after the initiation of docket 14454, the Commission should have inferred that the information was unfavorable to Southwestern's case and, therefore, favorable to the Cooperative's case.[35] *Cf. McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 198 (Tex. App.—Austin 2005, pet. denied) (explaining that

---

[34] As discussed in footnote 10, this Court remanded docket 14454 to the Commission with the instruction that the Commission consider the res judicata arguments made by the parties. *Lamb County Elec. Coop.*, 2001 Tex. App. LEXIS 173, at *24. In particular, the Commission was to consider the Cooperative's assertion that the doctrine did not apply in this case because there had been a material change in circumstances from the time that the Cooperative first complained about the service that Southwestern was providing in docket 2991. In his proposal in docket 24229, the administrative law judge characterized the six types of information requested as being "primarily" relevant to the res judicata issue. Docket 24229 (Mar. 6, 2003) (Proposal for Decision). Specifically, the administrative law judge concluded that "if the Commission concurs with the ALJ regarding the scope of [Southwestern]'s original certification rights, the entire issue of changed circumstances—and the alleged unavailability of data to fully address them—is moot." Although the information requested does seem to be more relevant to the res judicata issue and although that issue is not before this Court in this appeal, in the interests of justice, we will address the information in relation to the issue of whether Southwestern was exceeding the scope of its certificates.

[35] As support for this assertion, the Cooperative refers to several federal cases explaining that courts may make negative inferences against a party who destroyed evidence if the party was aware of potential claims against it and of the potential relevance of the evidence. *See, e.g.*, *Caparotta v. Entergy Corp.*, 168 F.3d 754, 756 (5th Cir. 1999); *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1158 (1st Cir. 1996).

"spoliation instruction tells the jury that, if a party has control over a piece of evidence and fails to retain or produce it, the jury should presume that the evidence would have been unfavorable to the party who controlled the evidence"). Because the Commission did not specifically make the suggested inference, the Cooperative asserts that the Commission committed reversible error.

Alternatively, the Cooperative contends that even if the Commission did not err by failing to make the inference previously described, the Commission erred by failing to order another type of sanction for failing to produce all the information requested in the preliminary order.[36] *See Trevino v. Ortega*, 969 S.W.2d 950, 951, 953 (Tex. 1998) (explaining that courts may impose sanctions for "spoilation of evidence"). For example, the Cooperative suggests that the Commission could have determined that Southwestern failed to meet its burden of proof regarding its certification rights. Further, the Cooperative contends that the Commission's failure to sanction Southwestern prejudiced the Cooperative.

As support for its arguments, the Cooperative cites to the rule of civil procedure allowing for the imposition of sanctions for discovery abuses. *See* Tex. R. Civ. P. 215.3. As a preliminary matter, we note that it is not entirely clear that the rules of civil procedure apply to Commission proceedings. *See AEP Tex. Cent. Co. v. Public Util. Comm'n*, 258 S.W.3d 272, 298-99 (Tex. App.—Austin 2008, pet. filed) (Patterson, J., concurring and dissenting) (op. on reh'g). In

---

[36] In support of his argument, the Cooperative cites to several federal cases stating that courts may impose appropriate remedies when evidence spoilation occurs. *See, e.g.*, *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78-79 (3d Cir. 1994).

fact, the Commission has its own rule regarding the types of sanctions that may be imposed for discovery abuses. *See* 16 Tex. Admin. Code § 22.161 (2008).

Regardless of which body of law governs the ability of the Commission to impose sanctions, the Commission has discretion when deciding whether to impose sanctions. *See* Tex. R. Civ. P. 215.3 (explaining that courts "may" impose appropriate sanctions for engaging in discovery abuse); 16 Tex. Admin. Code § 22.161(b), (d) (stating that administrative law judges and Commission "may" impose sanctions); *see also* Tex. Gov't Code Ann. § 311.016 (West 2005) (explaining that word "may" "creates discretionary authority or grants permission or a power"); *cf. McMillin*, 180 S.W.3d at 199 (recognizing that appellate courts review decision to impose discovery sanctions under abuse of discretion standard because "trial judges are in the best position to evaluate the often complex facts and equities of discovery disputes and determine whether discovery abuse has in fact occurred, the relative culpability and harm of such conduct, and the credibility of a party's attempts to explain delays and unresponsiveness").

For the reasons that follow, we conclude that the Commission did not abuse its discretion. *See Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 696 (Tex. 2008) (explaining that only actions that are arbitrary, unreasonable, or without reference to any guiding principles constitute abuses of discretion). As discussed previously, during both dockets 8 and 42, Southwestern and the Cooperative entered into agreements concerning what customers and areas each would serve, *see* Tex. Util. Code Ann. § 37.155, and the Commission determined that those agreements allowed Southwestern to serve the existing and future needs of its preexisting customers that were located inside the Cooperative's service area. Further, that determination was supported by substantial

54

evidence. For these reasons, information regarding the change in the amount of electricity being delivered to the area in dispute and information demonstrating the number of consuming facilities being served prior to certification were unnecessary to resolve the controversy of whether Southwestern was exceeding the scope of its certificates.

Morever, even assuming that the prior determination does not resolve the issue, we would still be unable to conclude that the Commission abused its discretion by failing to impose a sanction on Southwestern. The Commission's rules state that the Commission may impose a sanction that is "appropriate and justified." 16 Tex. Admin. Code § 22.161(c). Similarly, the rules of civil procedure allow for the imposition of sanctions that are "appropriate." Tex. R. Civ. P. 215.3; *see also PR Invs. v. State*, 251 S.W.3d 472, 480 (Tex. 2008) (explaining that discovery sanction "should be no more severe than necessary to satisfy its legitimate purposes"). Moreover, case law specifies that sanctions should be imposed on a party only when the party had a "duty to preserve evidence" and "negligently or intentionally" destroyed the evidence and when the destruction of the evidence "prejudiced" the other party's "ability to present its case or defense." *McMillin*, 180 S.W.3d at 198; *see Adobe Land Corp. v. Griffin, L.L.C.*, 236 S.W.3d 351, 357 (Tex. App.—Fort Worth 2007, no pet.).

As discussed previously, the information that was not provided was historical data regarding the amount of electricity that was delivered. When testifying about the information, Southwestern's witness, Mitch Elmore, admitted that not all of the information was available and stated that Southwestern "had gone through two major customer accounting changes since 1976, and only the minimum required data was maintained after the conversion in 1999." As a result,

Southwestern could not provide customer history data "back to the original date of service in the accounting system."

However, although Southwestern could not produce the information that was lost, Southwestern did provide an estimate of the lost information. In particular, it provided an estimate of the past and present load in the Cooperative's service area by comparing the number of wells that were present in the Cooperative's area prior to certification and the number of wells that were in the area at the time of the contested-case proceeding. In light of this, the administrative law judge concluded that Southwestern "reasonably reconstructed the pertinent information lost in the accounting change over." Docket 24229 (Mar. 6, 2003) (Proposal for Decision).

Moreover, when describing the information that was lost, the administrative law judge reasoned that the information that Southwestern lost would not have shown what amount of electricity had been provided to customers inside the Cooperative's service area. *Id.* Specifically, the administrative law judge stated that the information was unavailable because Southwestern provided "service at a primary meter point" and provided "a bill for the entire field—not broken down by individual wells or by which wells were located in [the Cooperative's] service area and which were not."

This determination is supported by Elmore's testimony in docket 24229. Elmore stated that because many of the disputed areas only received service through a single delivery point and because many of the disputed areas straddled the boundaries between Southwestern's and the Cooperative's service area, "it is not possible to identify" the portion of the electricity that ultimately powered consuming facilities located inside the Cooperative's service area. Further, Elmore testified

that Southwestern often only sent one bill to a customer for all of the electricity that was sent to that customer and that, accordingly, the bills it sent made no distinction between consuming facilities located inside Southwestern's service area and those located inside the Cooperative's service area. Moreover, as described earlier, Hunter testified that it was common industry practice for a utility to provide service to an oil operator by delivering the electricity to a delivery point and allowing the customer to distribute the power to its facilities through its own lines.

Given that the information requested by the Commission was not necessary to the Commission's ultimate resolution of this case, that the administrative law judge concluded that the lost information would not have provided the type of information that the Commission originally requested, that the evidence demonstrating that Southwestern did not routinely track the information originally requested, and that Southwestern attempted to provide a substitute for the lost information, we cannot conclude that the Commission abused its discretion by failing to conclude that neither a negative inference nor another sanction was appropriate or justified in this case. *See Trevino*, 969 S.W.2d at 953 (noting that "there is no one remedy that is appropriate for every incidence of" discovery abuse and that "court must respond appropriately based upon the particular facts of each individual case").

For these reasons, we overrule the Cooperative's sixth and seventh issues on appeal.

**CONCLUSION**

Having overruled all of the Cooperative's issues on appeal, we affirm the judgment of the district court.

57

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear;
    Concurring Opinion by Justice Patterson

Affirmed

Filed:   November 7, 2008